# EXHIBIT 11

COMPLAINT - 56



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5704

February 12, 2019

J. Scott Miller
Law Office of Scott Miller, P.S.
201 W. NORTH RIVER DRIVE
SUITE 305
SPOKANE, WA 99201

RECEIVED

FEB 18 2019

Law Offices of
J. Scott Miller PS

RE:    Long Term Disability (LTD) Benefits
       Crawford & Company
       Claim #: 8077199
       Claimant: Kelly Moat

Dear J. Scott Miller:

We reviewed your appeal request for Long Term Disability (LTD) benefits, on behalf of Kelly Moat, and maintained the decision to deny benefits.

### Initial Claim Decision

Mr. Moat submitted a claim for his absence from work as of February 10, 2018, as a result of neuropathy in feet and hands. Mr. Moat's LTD benefits were due to begin on August 11, 2018, after the Policy's elimination period was completed. However, his claim was denied as the evaluation concluded he was not disabled throughout and beyond the Policy's elimination period.

The basis for the decision was outlined in a letter dated June 13, 2018. Mr. Moat was provided an opportunity to request an appeal review of the denial, stating the reasons why he felt that his claim should not have been denied, and submit additional information to support his claim. Specifically, he was advised to submit the following information:

> "All office notes, physical therapy notes, a valid Functional Capacity Evaluation, test results, hospital records, therapy records, operative reports, prescription histories, treatment plans and any other medical records from all treating physicians that would support that you are unable to perform the duties of your occupation n both a part time and full time basis. You should also provide any additional information that you feel will support your claim."

### Appeal

On June 22, 2018, we received a letter from your office stating there were errors in the June 13, 2018 letter. The errors included misquoting definitions and ignored the physician's report. Your

letter states that the physician's report clearly outlines that Mr. Moat was disabled from the occupation he was performing at the time he became disabled. Also, in your letter you outlined the physical requirements of Mr. Moat's occupation as a Senior Property Adjuster and the reviewing physician stated Mr. Moat was unable to perform many of the required tasks. Therefore, Mr. Moat is eligible for LTD benefits. In addition, you indicated that Mr. Moat's claim was reviewed in our Vocational Department for an occupational analysis. Regardless of their conclusion, the opinion disregarded the LTD policy requirement that Mr. Moat be capable of performing the job duties of his own occupation, not a hypothetical sedentary position. You requested we reconsider the wrongful denial by June 19, 2018. You also attached a job description for a Senior Adjuster.

We received an intent to appeal letter from you on behalf of Mr. Moat. The letter also requests that we reconsider the denial of benefits because of misinterpretation of the policy language. In support of Mr. Moat's appeal, you submitted a copy of the June 22, 2018 letter and the Senior Adjuster job description.

We wrote to you on June 28, 2018, regarding your intent to submit additional information for Mr. Moat's appeal. The letter stated in order for Liberty Life Assurance Company of Boston to conduct a timely review of his appeal, we must receive the additional information you wished to have considered in our appeal review by December 9, 2018.

On August 24, 2018, we received a letter from your office requesting a complete copy of Mr. Moat's STD and LTD claim files. You also requested a copy of the Summary Plan Description for both claims, information regarding the Neurology review, and brochures regarding disability benefits provided to Mr. Moat as an employee of Crawford and Company.

We wrote to you on August 28, 2018 regarding your intent to submit additional information for Mr. Moat's appeal. We also provided a complete copy of Mr. Moat's disability file and the Crawford and Company LTD policy.

On December 4, 2018, we received a fax from your office. The December 3, 2018 letter stated in your August 20, 2018 letter you requested a summary plan description and LTD policy. You indicated you did not receive the documents and to please forward immediately.

We responded to your request on December 4, 2018, stating the requested information was sent on August 29, 2018. However, we resent the information. The letter also outlined the deadline to submit Mr. Moat's appeal was December 10, 2018. In addition, the letter indicated that if you required an extension, to please send a written request with a proposed extension deadline. If we did not receive an extension request, Mr. Moat's claim would be assigned for review on December 10, 2018.

On December 11, 2018, we received an appeal from your office on behalf of Mr. Moat. In your letter you stated there was no dispute that Mr. Moat is eligible for both STD and LTD benefits. The letter indicated the Crawford and Company LTD plan is self-insured. Crawford is the plan sponsor and retains authority to render all final claim decisions. The letter outlined what information was submitted for Mr. Moat's appeal, facts pertaining to the Senior Property Adjustor job description, facts pertaining to Mr. Moat's medical conditions, information regarding receipt of STD benefits through August 10, 2018, information regarding LTD, information regarding Mr. Moat's termination from Crawford and Company, and the improper contractual basis for denying the LTD claim.

COMPLAINT - 58          2 of 13

In support of Mr. Moat's appeal, you submitted the following information:

- June 20, 2003 office note
- December 5, 2005 New Patient Information Form
- December 5, 2005 Chest x-ray
- February 28, 2008 Chest x-ray
- March 25, 2008 EKG
- July 20-23, 2011 Sleep study summary & Ambulatory Sleep Study Report
- August 22, 2011 Oxygen & Respiratory information
- October 28, 2011 x-ray of bilateral knees
- June 19, 2012 x-ray of right foot
- June 6, 2013 Colonoscopy
- June 6, 2013 Surgical Pathology Report
- February 9, 2016 x-ray of bilateral knees
- February 9, 2016 prescription for Hydrocodone & bilateral knee braces from Dr. Hart
- March 25, 2016 prescription for Hydrocodone from Dr. Hart
- May 23, 2016 x-ray of neck
- June 23, 2016 prescription for Hydrocodone from Dr. Hart
- September 14, 2016 prescription for Hydrocodone from Dr. Hart
- November 29, 2016 eye exam with Douglas Lyman, OD
- December 13, 2016 prescription for Hydrocodone from Dr. Hart
- March 1, 2017 prescription for Hydrocodone from Dr. Hart
- June 1, 2017 prescription for Hydrocodone from Dr. Hart
- July 10, 2017 prescription for Hydrocodone from Dr. Hart
- July 10, 2017 Chest x-ray
- November 20, 2017 prescription for Hydrocodone from Dr. Hart
- January 25, 2018 referral from Dr. Mark Hart to Northwest Neurologist, Dr. Pugh
- February 14, 2018 prescription for Hydrocodone from Dr. Hart
- February 23, 2018 Consultation note from Dr. Steven Pugh (previously on file)
- March 7, 2018 Nerve Conduction Studies of the feet (previously on file)
- March 26, 2018 prescription for Hydrocodone from Dr. Hart
- April 16, 2018 prescription for Hydrocodone from Dr. Hart
- April 18, 2018 Clinical Visit Summary from Dr. Pugh (previously on file)
- May 1, 2018 STD approval/extensions notification to Crawford & Company
- May 4, 2018 Occupational Analysis/Vocational Review
- May 14, 2018 laboratory test results
- May 14, 2018 prescription for Hydrocodone and Lisinopril from Dr. Hart
- June 13, 2018 LTD denial letter
- June 14, 2018 medical report from Dr. K. Sivakumar
- July 2, 2018 referral from Dr. Hart to Arthritis Northwest
- July 6, 2018 letter to Dr. Hart from Arthritis Northwest
- July 25, 2018 x-ray of hands
- July 25, 2018 laboratory test results
- August 1, 2018 referral from Dr. Hart to Arthritis Northwest
- August 7, 2018 letter to Dr. Hart from Arthritis Northwest
- August 11, 2018 Medication List from Arthritis Northwest
- August 11, 2018 Arthritis Northwest Notice of Privacy Practices Acknowledgment

COMPLAINT - 59

- August 16, 2018 Consultation note from Dr. Sean LaSalle
- August 16, 2018 letter to Dr. Hart from Dr. Sean LaSalle
- September 6, 2018 prescription for Hydrocodone from Dr. Hart
- September 6, 2018 skin biopsy of right arm
- October 8, 2018 letter to Mr. Moat from Kellie Parham, HR from Crawford & Company
- October 12, 2018 Statement from Arthritis Northwest
- October 17, 2018 Declaration of Records Custodian from Sierra Sexton
- October 19, 2018 Activity Listings from Northwest Neurological PLLC
- October 29, 2018 letter from Vickie Gunn Crawford Legal Department to Northwest Document Retrieval, LLC
- October 29, 2018 Declaration of Records Custodian from Vickie Gunn
- October 30, 2018 Declaration of Records Custodian from Madison White
- November 13, 2018 prescription for Hydrocodone from Dr. Hart
- November 13, 2018 laboratory test results
- November 14, 2018 Letter from Dr. Pugh
- November 27, 2018 Declaration of Records Custodian from Connie Vosahlo
- December 6, 2018 Declaration of Kelly Moat
- Employment records from Crawford & Company
- Senior Property Adjuster Job Description
- Patient History Form and Confidential Patient profile from Arthritis Northwest
- Office notes from Dr. Hart dated March 25, 2008 through November 13, 2018
- Insurance information and statements from Hart Family Medicine
- Medication Flowsheet from Dr. Hart
- Laboratory test results from Dr. Hart dated December 5, 2005 through February 14, 2018
- Crawford & Company Group Disability Income Policy – STD & LTD

On December 17, 2018, we received an email from your office stating policy forms change regularly. Therefore, your office needed a certified copy of the policy Liberty Mutual claimed was in effect for Mr. Moat's disability claim. In addition, you stated the copy that was provided was incomplete and outlined the missing pages. The email also outlined that "*If the Contract Analyst and Account Service Manager intends to certify that the forms provided are "complete" with missing pages, and this matter goes to litigation, we will advise the federal judge of this email exchange, and any attempt to introduce additional pages will be met with a motion for sanctions.*"

We received a supplemental submission for Mr. Moat's appeal on January 8, 2019. The letter stated Mr. Moat reapplied to Crawford & Company for reasonable accommodations. Crawford & Company was unable to accommodate. A January 3, 2018 letter was attached from Kellie Parham, HR at Crawford & Company.

### Appeal Evaluation

During the initial claim evaluation, Mr. Moat's claim was reviewed by an independent physician, Board Certified in Neurology. The medical evaluation indicated the diagnoses supported by the medical evidence included diabetes, polyneuropathy, and ataxia. The diagnoses causing impairment included polyneuropathy and ataxia. The physician concluded because of Mr. Moat's difficulty in balance, loss of dexterity in hands, with pain in hands and feet, he could not perform any work more than a sedentary occupation. The physician also stated his limitations may include climbing at heights and keyboarding. However, after speaking with Dr. Steven Pugh, the physicians agreed Mr.

COMPLAINT - 60            4  of 13

Moat would be restricted to a sedentary occupation and keyboarding would not be an issue.

The information received on appeal included a February 14, 2018 office note from Dr. Hart. Mr. Moat was being seen for a three-month diabetic checkup and blood work. The office note indicated Mr. Moat's A1c was 7.5 so insulin was not started. It was noted Mr. Moat had been feeling well, but had not gotten very active. Mr. Moat's vital signs were stable and his examination was normal. Dr. Hart noted that Mr. Moat continued to struggle with bilateral neuropathy in both legs. The overall impression was diabetes mellitus, hypertension, hyperlipidemia, and bilateral neuropathy of the legs. The treatment plan indicated that Mr. Moat's prescription for Hydrocodone was refilled, blood work was ordered, return to the office in three months, and as long as the A1c was reasonable, they would postpone the insulin.

A February 14, 2018 laboratory testing indicted an elevated (estimated average) glucose at 177. Mr. Moat's A1c was 7.8.

On February 15, 2018, Mr. Moat was notified of the laboratory results.

A March 1, 2018 office note indicated Mr. Moat had some medications refilled.

The March 7, 2018 nerve conduction studies showed evidence of mild axonal sensorimotor polyneuropathy in the bilateral lower extremities. The report noted that this type of polyneuropathy can be caused by various toxic and metabolic disturbances such as diabetes, familial neuropathies, and many idiopathic in terms of etiology.

The March 9, 2018 nerve conduction studies of both hands indicated there was no evidence of diffuse neurogenic process or peripheral polyneuropathy.

A March 26, 2018 office note indicated Mr. Moat had some medications refilled.

The March 26, 2018 office note from Dr. Hart indicated Mr. Moat was being seen for a sinus infection. Dr. Hart noted that Mr. Moat had been taking pain medication for neuropathy of the legs and needed a refill. Mr. Moat's vital signs were stable. On examination, it was noted Mr. Moat had a nocturnal productive yellow cough, tympanic membranes had fluid, frontalmaxillary sinus pressure and pain, and bilateral peripheral neuropathy in legs. Mr. Moat indicated his legs were painful at night. The treatment plan included to start Levaquin and use Phenergan with codeine cough syrup, and Hydrocodone.

The July 2, 2018 referral from Dr. Hart indicated Mr. Moat was being referred for a consultation for osteoarthritis of both hands.

The July 6, 2018 letter from Arthritis Northwest thanked Dr. Hart for the referral.

The July 25, 2018 office note which indicated Mr. Moat reported bilateral thumb pain and was trying to qualify for his personal disability policies. Dr. Hart noted Arthritis Northwest will see him without any laboratory testing or x-rays; however, Mr. Moat did have nerve conduction studies done which were normal. Mr. Moat's vital signs were stable. On examination, it was noted bilateral thumb pain at the base of the metatarsal. There was no nodularity or deformity of his digits. The overall impression was bilateral thumb pain. The treatment plan included laboratory testing and

COMPLAINT - 61                          5 of 13

x-rays of his hands. Dr. Hart refilled the prescription for Hydrocodone.

The July 25, 2018 x-ray of the hands indicated mild left first carpometacarpal and first interphalangeal osteoarthritis, moderately severe left intercarpal joint space narrowing suggesting an inflammatory arthropathy component versus sequelae of an old injury (no well-defined erosions were identified elsewhere), and negative left hand.

The July 25, 2018 laboratory test results included a normal rheumatoid arthritic factor and negative antibodies. Dr. Hart noted "no arthritis" on the lab results.

The July 30, 2018 office note from Dr. Hart stated Mr. Moat was notified of the laboratory testing and x-ray results.

The August 7, 2018 letter to Dr. Hart from Arthritis Northwest indicated Mr. Moat was scheduled for a consultation with Dr. Sean LaSalle on August 16, 2018.

The August 14, 2018 office note from Dr. Hart indicated he was being seen for a three month diabetic checkup. Mr. Moat was down three pounds. It was noted Mr. Moat was scheduled to see his arthritis physician. The examination was noted to be within normal limits. The overall impression was diabetes mellitus, hypertension, hyperlipidemia, BPH (benign prostatic hyperplasia), and bilateral neuropathy of the feet. The treatment plan indicated blood work was ordered and return in three months. Dr. Hart noted he hoped his A1C was down a little bit because Mr. Moat was maxed out on his oral medications.

The August 14, 2018 laboratory test results indicated Mr. Moat's glucose was elevated at 216 and A1c was at 8.1.

An August 16, 2018 office note from Dr. Hart indicated, "patient notified, will lose 20 pounds before next visit and wishes to avoid insulin."

The August 16, 2018 consultation note from Dr. Sean LaSalle indicated Mr. Moat continued to have pain in both thumbs due to osteoarthritis of the CMC joints. There was positive pain to palpation about the CMC joints on exam. The x-rays from July 25, 2018 confirmed degenerative disease. Mr. Moat also complained of his right shoulder pain due to mild bilateral shoulder bursitis without impingement. Dr. LaSalle recommended medication management and physical therapy. A referral for nutrition and weight management was offered.

The September 6, 2018 office note from Dr. Hart indicated Mr. Moat was seen for a biopsy of a mole on his right arm. The lesion was clear. Dr. Hart noted it could basal cell or keratosis. The plan was to remove the lesion and take a biopsy. The office note also indicated there was quite a bit of bleeding so Dr. Hart had to put a suture to close the area and bandage it.

On September 6, 2018, Dr. Hart refilled a prescription for Hydrocodone.

The September 6, 2018 skin biopsy of the right arm indicated the specimen was benign.

The September 11, 2018 office note from Dr. Hart indicated Mr. Moat had the suture removed.

COMPLAINT - 62                    6  of 13

The September 27, 2018 note from Dr. Hart's office noted Mr. Moat needed refills on medications.

A November 13, 2018 office note from Dr. Hart indicated medications were reviewed. Mr. Moat was being seen for a three-month diabetic checkup. Mr. Moat was down 17 pounds and continued to lose weight. Mr. Moat's vital signs were stable. The examination was noted to be normal. Dr. Hart did note that Mr. Moat continued to suffer bilateral foot pain secondary to diabetic neuropathy. The treatment plan included to refill his Hydrocodone, ordered blood work, return to the office for a three month appointment, and encourage to lose weight.

The November 13, 2018 laboratory test results indicated Mr. Moat's glucose was 154 and his A1c was 6.8. It was noted on the results "wow, great!"

The November 14, 2018 letter from Dr. Pugh addressed "To Whom It May Concern" indicated Mr. Moat was diagnosed with diabetic polyneuropathy. It has affected his proprioception which is the sensory nerve function especially in the lower extremities that allows proper balance. Mr. Moat's balance and equilibrium were beginning to fail which is not a reversible condition. Dr. Pugh stated it would not be safe for his patient to negotiate uneven surfaces or heights. Dr. Pugh stated his understanding of an insurance inspector/adjuster is expected to climb on roof tops, at heights using ladders or other means to inspect property. Dr. Pugh went on to state this would put Mr. Moat at risk of falling due to his neurological condition. Lastly, Dr. Pugh stated under no circumstances would he support Mr. Moat returning to work as an insurance inspector.

The December 6, 2018 Declaration from Kelly Moat indicated during a physical in 2009 he was diagnosed with diabetes. In 2010, during pressurized flights he noticed light burning between his toes. Also in 2017, Mr. Moat started feeling significant burning and sharp pains in both feet. In mid-2017, Mr. Moat started feeling the pain creep up his legs and then began having pains in his hands. Mr. Moat stated it feels like his finger was smashed at the nail when the finger was touched. After Mr. Moat began experiencing these symptoms, he did not tell his supervisor or family doctor because he didn't want put his job in trouble. Mr. Moat stated he was having trouble typing and was spending extra time correcting mistakes which led to a discussion with his manager in late January 2018. Mr. Moat shared his medical problems and then was immediately removed from field work. Mr. Moat also stated he did his best to complete his work and on February 9, 2018, he was advised to stop working and was placed on STD. Mr. Moat also provided his treatment as well as the use of dictation software. Mr. Moat stated the hand nerve damage appears to be permanent and progressive like the symptoms he has with his feet. Lastly, Mr. Moat stated he has significant pain in his thumbs, shoulders, and wrists. He was diagnosed with osteoarthritis.

During the review of Mr. Moat's appeal, his claim was reviewed by a Dr. Farjallah Khoury, an independent physician Board Certified in Physical Medicine & Rehabilitation. Dr. Khoury's medical evaluation stated the records supported the diagnoses diabetic polyneuropathy, abnormal gait and mobility, osteoarthritis of the CMC joints, and right shoulder pain due to mild bilateral shoulder bursitis without impingement. The medical records did support functional impairment due to diabetic polyneuropathy with abnormal gait and mobility from February 10, 2018 forward. Dr. Khoury further explained Mr. Moat reported *"numbness, burning and paresthesias in both lower extremities. On exam, there is 4/hip flexion and ADF weakness bilaterally. Tandem gait is poor, balance is impaired, and positive Romberg. Stocking and glove hypesthesia is also observed. He has inaccurate movements. Electrodiagnostic study showed evidence of mild diffuse axonal sensorimotor polyneuropathy. Gabapentin was recommended for neuropathic pain. Functional*

COMPLAINT - 63

*impairment and restrictions are applicable due to impaired balance, gait, and coordination in the setting of electrodiagnostic evidence of polyneuropathy.*" In addition, Dr. Khoury stated that Mr. Moat was "*noted to have pain thumb with osteoarthritis of the CMC joints, and right shoulder pain due to mild bilateral shoulder bursitis without impingement. These conditions were not described as functionally limiting. On exam, there was no evidence of deformity or limited mobility due to these conditions.*" Mr. Moat's functional impairment translated into the following restrictions and limitations due to his impaired balance, gait, and coordination along with the electrodiagnostic evidence:

- Pushing, pulling, lifting, and carrying of 25 pounds occasionally, and 15 pounds frequently
- Never climb ladders
- Standing or walking - no specific restrictions
- Sitting - no specific restrictions
- Reach at desk level, below-waist level, and overhead on a frequent basis
- No handling, fingering, or feeling restrictions
- Ability to sustain full time capacity within the restrictions and limitations

Mr. Moat's claim was *previously* reviewed by a vocational consultant, who completed an occupational analysis to identify the material and substantial duties of his occupation as it is normally performed in the national economy. The analysis showed his job tasks were best represented by the occupational titles of Claim Examiner, Adjuster, and Investigator. This occupational title has four Dictionary of Occupational Titles (DOT) descriptions and two Standard Occupational Classification/Occupational Information Network (SOC/O*NET) descriptions that accurately reflect the totality of the occupation. The DOT descriptions range from a sedentary to light physical demand level.

Taking into consideration the nature of the work outlined above in the DOT and SOC/O*NET descriptions, this occupation is most often performed at the sedentary and light physical demand levels.

The Department of Labor defines sedentary work as,

> "**S-Sedentary Work** - Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."

Positional requirements in sedentary environments include:

- **Frequent and Constant** sitting
- **Frequent** handling, fingering
- **Occasional** standing, walking, bending/stooping, twisting, reaching
- **No** kneeling, crouching/squatting, crawling, climbing, balancing

COMPLAINT - 64                8  of 13

The Department of Labor defines light work as,

> "L-Light Work - Exerting up to 20 pounds of force occasionally, and /or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for sedentary work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible."

Positional requirements in light environments include:

- **Frequent** sitting, standing, reaching, handling and fingering
- **Occasional** walking, bending/stooping, twisting, kneeling, crouching/squatting, crawling,
- climbing, balancing

This appeal review and analysis considered all the medical and claim documentation contained in Mr. Moat's LTD administrative record, whether or not specifically referenced in this document. The appeal review concludes that as a result of polyneuropathy of the feet and ataxia, the medical records support impairment which requires Mr. Moat to work within sedentary restrictions and limitations. The reasonably supported medical restrictions and limitations are outlined above in Dr. Khoury's medical evaluation. As outlined in Dr. Khoury's medical evaluation, on examination Mr. Moat's tandem gait was poor, balance was impaired, and he had a positive Romberg. Stocking and glove hypesthesia was also observed. He had inaccurate movements. The electrodiagnostic study showed evidence of mild diffuse axonal sensorimotor polyneuropathy. Gabapentin was recommended for neuropathic pain. The functional impairment and restrictions are due to Mr. Moat's impaired balance, gait, and coordination in the setting of electrodiagnostic evidence of polyneuropathy. However, the nerve conduction studies of the hands showed no evidence of diffuse neurogenic process or peripheral polyneuropathy. Examination findings of Mr. Moat's hands do not provide any evidence of deformity or limited mobility. The appeal review also concludes the medical evidence supports a diagnosis of diabetes mellitus. However, the records do not support Mr. Moat's diabetes was uncontrolled as there are no signs of frequent infections, kidney problems, vision problems, or heart disease. Therefore, based on the totality of medical information, the restrictions and limitations outlined by Dr. Khoury would not have precluded Mr. Moat from performing his Own Occupation throughout and beyond August 11, 2018.

We acknowledge Mr. Moat's claims of total impairment based on polyneuropathy of the feet and hands indicating his inability to work. However, the medical evidence has been reviewed by specialists in Physical Medicine & Rehabilitation. The medical evidence does support some impairment, however, it does not support a total inability to function in an occupational setting, specifically, the medical evidence does not support he is unable to perform his Own Occupation in a sedentary position and within the restrictions and limitations noted above.

COMPLAINT - 65

### Conclusion

We conducted a thorough and independent review of Mr. Moat's entire claim. In summary, we acknowledge you may have continued to experience some impairments and symptoms associated with his conditions. However, the medical documentation on file does not contain physical examination findings, mental status examination findings, diagnostic test results, or other forms of medical documentation supporting his impairments and symptoms remained of such severity, frequency, and duration that they resulted in restrictions or limitations rendering him unable to perform the duties of his occupation throughout and beyond the Policy's elimination period.

After a complete evaluation of the claim, including your appeal, all medical reviews completed on the file, and taking into consideration the opinion of Mr. Moat's providers as set forth in their written record, we determined the clinical evidence does not support Mr. Moat was precluded from performing his Own Occupation from February 10, 2018 forward. Our position remains that Proof of Disability in accordance with the Policy provisions has not been provided, and our original determination to deny benefits is upheld. Therefore, no benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

### Policy Provisions

In order to receive benefits, Mr. Moat must satisfy the requirements of all Policy provisions that state, in part:

### LONG TERM DISABILITY COVERAGE

#### Disability Benefit

*When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:*

*1. Disability;*
*2. Regular Attendance of a Physician; and*
*3. Appropriate Available Treatment.*

*The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

*"Disability"* or *"Disabled"*, with respect to Long Term Disability, means:

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

   i. that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

   ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

*"Own Occupation"*, with respect to Long Term Disability, means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

*"Material and Substantial Duties"*, with respect to Long Term Disability, means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

*"Proof"* means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Liberty.

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mr. Moat was entitled to appeal the decision made by Liberty Life Assurance Company of Boston (Liberty) now a Lincoln Financial company, and to submit any additional information he wished to be considered as part of the appeal. Liberty has conducted a full and fair review of his appeal and accompanying materials, and has concluded that the denial of benefits will be maintained.

At this time, Mr. Moat's administrative right to review has been exhausted; no further review will be conducted by Liberty and his claim will remain closed. Mr. Moat may request to receive, free of charge, copies of all documents relevant to his claim. He has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

COMPLAINT - 67

The Crawford & Company's Group Disability Income Policy contains the below provision:

***Legal Proceedings***

*A claimant or the claimant's authorized representative cannot start any legal action:*

1. *until 60 days after Proof of claim has been given; or*

2. *more than one year after the time Proof of claim is required.*

If Mr. Moat's policy is subject to ERISA, he may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact his local U.S. Department of Labor Office or his state insurance regulatory agency. In addition, once all required reviews of Mr. Moat's claim has been completed, he has the right to bring a civil action under applicable law. His employer's policy has a contractual limitations period of one year, which means that a lawsuit must be brought within one year after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is November 9, 2019.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston now a Lincoln Financial company rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Liberty Life Assurance Company of Boston are based on the provisions outlined in the Crawford & Company LTD Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact Liberty Life to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便于解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł ninízingo saad hosíniłį' dóó ná'ookaah niiníłįago naaltsoos níiníłtsoozígíí hazho'ó bik'idi'deeshtįįł ninízingo doo bááh ílínígóó níká a'doowoł éí biniiyé shil hodiilnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong

mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Jane Daniell
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 16393
Secure Fax No.: (603) 334-5704

COMPLAINT - 69                    13 of 13